United States District Court
Southern District of Texas

**ENTERED**

April 20, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER G-04-020-02 |
| | § | |
| ELIAS LUIS HERRERA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Elias Luis Herrera ("Defendant") has filed a Motion to Dismiss the Indictment with Prejudice Based on the Violation of His Constitutional Right to a Fair and Speedy Trial ("Defendant's Motion") (Docket Entry No. 37).

## I.  Factual Background

On July 17, 2003, the FBI was notified of a sexual assault (rape) that occurred on a Royal Caribbean Cruise Line ("RCCL") ship called the RHAPSODY OF THE SEAS while the ship was located in the Special Maritime and Territorial Jurisdiction of the United States.[1]  On July 20, 2003, Special Agent Stone boarded the ship in Galveston, Texas, and interviewed the victim, a 15-year-old

---

[1] Affidavit of FBI Special Agent Benjamin R.P. Stone, Exhibit 1 to United States of America's Response in Opposition to Defendant's Motion to Dismiss the Indictment Based on Constitutional Speedy Trial Rights ("Government's Response"), Docket Entry No. 38-1, p. 1 ¶ 2.  All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

girl whom he identifies in his affidavit as "KL."[2]  KL described
how she was raped by two unidentified crew members during the early
hours of July 17, 2003.[3]  After reporting the rape to officials
aboard the ship, KL was examined by a physician who collected
physical evidence including vaginal swabs.[4]  The physician provided
this evidence to Special Agent Stone.[5]  Special Agent Stone inter-
viewed several crew members including Defendant, who voluntarily
provided a buccal DNA swab.[6]  Stone submitted Defendant's DNA swab
and the physical evidence from KL to an FBI laboratory for DNA
analysis.[7]

On August 4, 2003, an attorney representing RCCL told Stone
that Defendant had "jumped ship" from RHAPSODY OF THE SEAS on
July 30, 2003, while the ship was docked in Cozumel, Mexico.[8]  In
January of 2004 RCCL's Manager of Security told Stone that
Defendant was reported missing from RHAPSODY OF THE SEAS on
July 25, 2003 — five days after Defendant was interviewed by the
FBI in Galveston, Texas.[9]

---

[2] Id. ¶¶ 3-4.

[3] Id. ¶ 4.

[4] Id.

[5] Id.

[6] Id. ¶¶ 5-6.

[7] Id. ¶ 7.

[8] Id. at 2 ¶ 8.

[9] Id. ¶ 9.

On February 4, 2004, Special Agent Stone received a report from the FBI Laboratory that identified Defendant as the major contributor of seminal fluid recovered as part of the examination of KL.[10]  On December 15, 2004, a federal grand jury sitting in the Southern District of Texas indicted Defendant and Edgerton Phillip Medford on one count of Aggravated Sexual Abuse in violation of 18 U.S.C. § 2241(a)(1) and one count of Sexual Abuse in violation of 18 U.S.C. § 2242(2).[11]

On December 17, 2004, Special Agent Stone "set a lead" to the FBI office in Panama City, Panama, to locate Defendant in Nicaragua.[12]  Included in the information Agent Stone sent to the office were details he learned about Defendant from a review of his employment records, including Defendant's date of birth, address, telephone number, passport number, emergency contact information (his mother), employment reference, recruiting agent, previous supervisor, and previous employer.[13]  Stone also made a request through the Regional Security Officer of the United States Department of State ("State Department"), but no information regarding Defendant's location was provided to the FBI.[14]

---

[10]<u>Id.</u> ¶ 10.

[11]Indictment, Docket Entry No. 32, pp. 1-2.

[12]Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 2 ¶ 14.

[13]<u>Id.</u>

[14]<u>Id.</u>

On December 20, 2004, Magistrate Judge John Froeschner issued arrest warrants for Defendant and Medford.[15]  At the same time, details concerning Defendant's arrest warrant were placed into the National Crime Information Center ("NCIC").[16]  Special Agent Stone stated that since the entry into NCIC, "the FBI has routinely conducted required NCIC audits to ensure the warrant for [Defendant] was still valid and to confirm [Defendant] was still wanted."[17]

On June 17, 2005, an INTERPOL Red Notice for Defendant (a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action) was issued by INTERPOL Washington, DC.[18]  On July 2, 2007, Agent Stone "set a lead" to an FBI office in Mexico City, Mexico, requesting any details concerning entry and exit of Defendant from Mexico, but Mexican authorities were unable to provide any information concerning Defendant.[19]

On October 3, 2013, Nicaraguan authorities issued another Red Notice for Defendant, this time because Defendant was wanted for drug smuggling.[20]  The description of Defendant included a

---

[15]Id. ¶ 12.

[16]Id. ¶ 13.

[17]Id.

[18]Id. ¶ 15.

[19]Id. ¶ 16.

[20]Id. ¶ 17.

Nicaraguan identity card number, his date and place of birth, his mother's maiden name, and a photograph that Agent Stone recognized as being of the same person he had interviewed back in July of 2003.[21]  On November 4, 2013, FBI Special Agent Richard Rennison set a lead to Panama City, again requesting assistance in locating Defendant, but received no response from Nicaraguan authorities regarding Defendant's location.[22]

Defendant was arrested in Costa Rica in 2014 for trafficking more than 737 kilograms of cocaine from Colombia to Costa Rica.[23] In 2016 a Costa Rican court sentenced Defendant to twelve years in prison.[24]  On September 10, 2019, FBI Special Agent Patrick York was notified through the Criminal Justice Information Services Division that Defendant had been arrested.[25]   On September 19, 2019, Costa Rican Prosecutor Elias Maxera told Assistant Legal Attaché Julia Igualada in Panama City that when Defendant was arrested he

---

[21]Id.

[22]Id. at 3 ¶ 18.

[23]News Articles Published Online Regarding Defendant's 2014 Arrest and 2016 Sentence in Costa Rica, Exhibit 2 to Defendant's Motion, Docket Entry No. 37-3, pp. 1, 3.

[24]Memorandum of Law in Support of Elias Luis Herrera's Motion to Dismiss the Indictment with Prejudice Based on the Violation of His Constitutional Right to a Fair and Speedy Trial ("Defendant's Memo"), Docket Entry No. 37-1, p. 7; Government's Response, Docket Entry No. 38, p. 1.

[25]Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 3 ¶ 20.

was carrying a false Honduran Identification Card.[26]  Defendant was
also carrying a Nicaraguan passport, which the Nicaraguan Ministry
of Foreign Affairs stated had "not been issued by the General
Directorate of Immigration and Foreign Affairs."[27]

In March of 2020 the United States sent the Costa Rican
government a provisional request for Defendant's arrest pending
extradition.[28]  Defendant claims that this is the first time he was
made aware of the sexual assault charges on which he had been
indicted over fifteen years earlier.[29]   On May 28, 2020, the
United States sent a formal request for Defendant to be extradited
to face charges of Aggravated Sexual Assault and Sexual Assault.[30]

On August 23, 2020, Costa Rican officials voluntarily
terminated the remainder of Defendant's 12-year sentence for the
drug conviction, but Costa Rica did not release Defendant because
its extradition treaty with the United States prevents it from
doing so.[31]   Defendant is currently being held in a Costa Rican
prison on the sexual assault charges pending extradition to the

---

[26]Id. ¶ 21.

[27]Id. at 4 ¶ 22.

[28]Government's Response, Docket Entry No. 38, p. 7 ¶ 21.

[29]Memorandum of Law in Support of Elias Luis Herrera's Motion
to Dismiss the Indictment With Prejudice Based on the Violation of
His Constitutional Right to a Fair and Speedy Trial ("Defendant's
Memo"), attached to Defendant's Motion, Docket Entry No. 37-1, p. 7.

[30]Government's Response, Docket Entry No. 38, pp. 1-2 ¶ 1.

[31]Defendant's Memo, Docket Entry No. 37-1, p. 7.

United States.[32]    The Government states that Defendant is "vigorously contesting his extradition to the United States in the Costa Rica judicial system."[33]

## II.  <u>Analysis</u>

Defendant argues that the fifteen-year delay between indictment and arrest violates his Sixth Amendment right to a speedy trial.[34]  The Government responds that the Sixth Amendment provides no relief for Defendant because he fled prosecution, evaded the Government's diligent efforts to locate him, and can point to no specific prejudice that resulted from the delay.[35] Moreover, the Government argues that Defendant's Motion should not even be considered because the "fugitive disentitlement doctrine" prevents Defendant from affirmatively contesting his charges until he personally appears within the Southern District of Texas.[36]

## A.   The Fugitive Disentitlement Doctrine

The Supreme Court has recognized the fugitive disentitlement doctrine at least since <u>Molinaro v. New Jersey,</u> 90 S. Ct. 498

---

[32]<u>Id.</u> at 20.

[33]Government's Response, Docket Entry No. 38, pp. 7-8 ¶ 22.

[34]Defendant's Memo, attached to Defendant's Motion, Docket Entry No. 37-1, p. 5.

[35]Government's Response, Docket Entry No. 38, pp. 13-20 ¶¶ 31-38.

[36]<u>Id.</u> at 8 ¶ 23.

(1970), in which it dismissed the appeal of a defendant who failed to surrender himself to state authorities after his bail was revoked.  The Court explained that "[w]hile such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims."  <u>Id.</u> at 498-99.  Since then federal courts have consistently applied the doctrine when necessary to "'limit[] a criminal defendant's access to the judicial system whose authority he evades.'"  <u>Bright v. Holder</u>, 649 F.3d 397, 399 (5th Cir. 2011) (quoting <u>Bagwell v. Dretke</u>, 376 F.3d 408, 410 (5th Cir. 2004)).

The doctrine is an equitable one that a court exercises in its discretion.  <u>Id.</u> at 400.  It is justified by several rationales, including the difficulty of enforcing judgments against fugitives, the encouragement of voluntary surrenders, the efficient operation of the courts, and respect for the judiciary and the rule of law.  <u>Id.; see also United States v. Shelton</u>, 482 F.2d 848, 849 (5th Cir. 1973) (dismissing the appeal of an escaped fugitive and citing "the discretion of the court to refuse to consider the claim of a litigant who indicates that he will comply with the court's decree only if it is favorable[.]"); <u>Dawkins v. Mitchell</u>, 437 F.2d 646, 649 (D.C. Cir. 1970) (declining to exercise jurisdiction over fugitive's civil suit to enjoin enforcement of an arrest warrant because "appellants have attempted to invoke only half our jurisdiction, i.e., the winning side").

-8-

"Although the fugitive disentitlement doctrine is often invoked during the appellate process, it also applies to pretrial motions made by fugitives in the district courts." United States v. Oliveri, 190 F. Supp. 2d 933, 936 (S.D. Tex. 2001) (citing United States v. Eagleson, 874 F. Supp. 27, 29-31 (D. Mass. 1994)). District courts have applied the doctrine to require defendants living abroad to submit to the jurisdiction of the United States before ruling on their motions. See, e.g., United States v. Hayes, 118 F. Supp. 3d 620, 627 (S.D.N.Y. 2015) (declining to rule on a Swiss defendant's motion to dismiss an indictment until he submitted himself to the court's jurisdiction); United States v. Chung Cheng Yeh, No. CR 10-00231 WHA, 2013 WL 2146572, at *3 (N.D. Cal. May 15, 2013) ("Until [defendant residing in Taiwan] is willing to submit his case for complete adjudication, however, he should not be permitted to utilize the resources of the court to determine isolated issues . . . . It would be a waste of resources to adjudicate advisory opinions at his behest."); United States v. Kashamu, 656 F. Supp. 2d 863, 868 (N.D. Ill. 2009) ("[Defendant living abroad] will not be permitted to litigate the merits of the Motion until he appears before the Court.").

United States v. Martirossian, 917 F.3d 883 (6th Cir. 2019), is particularly instructive. In that case an Armenian citizen living in China refused to answer criminal charges in the Southern District of Ohio. Id. at 886. When his lawyers filed a motion to dismiss the indictment, the district court declared him a fugitive

-9-

and refused to rule on the motion until he submitted himself to the district court.  Id.  On appeal the Sixth Circuit held that if the defendant needed the district court to decide his motion, he should "travel to Ohio and answer the charges or at least commit to accept the consequences, good or bad, of the ruling."  Id. at 887-88.  The court elaborated:

> Federal courts do not play "catch me if you can."  If a defendant refuses to show up to answer an indictment, ignores an arrest warrant, or leaves the jurisdiction, the court may decline to resolve any objections to the indictment in his absence.  What is known loosely as the fugitive disentitlement doctrine generally permits a federal court to insist on a defendant's presence in the jurisdiction before it resolves challenges to the criminal charges.

Id. at 885.

Defendant argues that the fugitive disentitlement doctrine should not apply against him because he is not a "fugitive."[37]  The court disagrees.  As explained by the Second Circuit,

> The intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending.  This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of charges while legally outside the jurisdiction, 'constructively flees' by deciding not to return.

United States v. Catino, 735 F.2d 718, 722 (2d Cir. 1984) (citations omitted).

---

[37]Defendant Elias Luis Herrera's Reply Brief to Defendant's Motion to Dismiss the Indictment With Prejudice Based on the Violation of His Constitutional Right to a Fair and Speedy Trial ("Defendant's Reply"), Docket Entry No. 39, pp. 6-7.

Even if Defendant did not know of the charges against him until March of 2020 as he claims,[38] his filing of the instant motion to dismiss is proof that he is aware of the charges now.  Thus his decision to continue fighting extradition is a decision "not to return" to the jurisdiction "having learned of [the] charges" — he is "constructively flee[ing]."  See Catino, 735 F.2d at 722.

Moreover, the court is not persuaded that a defendant must have actual knowledge of specific charges filed against him before he can be deemed a "fugitive."  In Donnell v. United States, 229 F.2d 560, 562 (5th Cir. 1956), the court held that a defendant was a fugitive because he "absented [himself] from the jurisdiction of the crime with the intent of escaping prosecution."  The Fifth Circuit relied on Streep v. United States, 16 S. Ct. 244, 246-47 (1895), in which the Court held that "it is quite clear that any person who takes himself out of the jurisdiction, with the intention of avoiding being brought to justice for a particular offense" is a "fugitive from justice."  The Court in Streep was explicit in holding that a defendant could be a fugitive even if no charges had yet been filed:  "It is sufficient that there is a flight with the intention of avoiding being prosecuted, whether a prosecution has or has not been actually begun."  Id. at 246.

Defendant was reported missing from RHAPSODY OF THE SEAS on July 25, 2003 — five days after being interviewed by the FBI in

---

[38]Defendant's Memo, attached to Defendant's Motion, Docket Entry No. 37-1, p. 7.

Galveston, Texas, and eight days after the alleged rape.[39] Nothing in the record indicates that Defendant gave his employer notice before leaving or informed the federal investigators who, just days before, had interviewed him in connection with the rape. These facts lead the court to conclude that Defendant jumped ship in Mexico and has remained outside the jurisdiction of the United States to avoid being prosecuted for this crime. Cf. In re Extradition of Ramos Herrera, 268 F. Supp. 2d 688, 698-99 (W.D. Tex. 2003) (flight from jurisdiction five days after crime was committed plus ongoing and deliberate absentia from jurisdiction rendered individual a fugitive). Defendant is a fugitive, and the fugitive disentitlement doctrine applies.

The Government states, and Defendant does not deny, that Defendant is vigorously contesting extradition in Costa Rica.[40] Presumably he would continue to fight the court's jurisdiction if his motion were denied, but would accept the court's jurisdiction if the court granted his motion. The court will not allow Defendant to "invoke only half [its] jurisdiction, i.e. the winning side." See Dawkins, 437 F.2d at 649.

The court finds that the fugitive disentitlement doctrine bars Defendant from now invoking the aid of the criminal justice system

---

[39]Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 2 ¶ 9.

[40]Government's Response, Docket Entry No. 38, pp. 7-8 ¶ 22; see also Defendant's Reply, Docket Entry No. 39, p. 5 (asserting that Defendant can seek dismissal of his indictment while he contests extradition).

-12-

that he has so long evaded. His motion will therefore be denied on that basis.

## B. Speedy Trial

Alternatively, because Defendant's Motion is fully briefed and because of the age of this case, the court in its discretion will reach the motion's substance and also deny it on its merits.

Defendant argues that the fifteen-year delay between his indictment for sexual assault charges and his arrest on those charges "cause[d] irreparable damage to the defense that cannot be fixed" and thus violated his right to a speedy trial.[41] Defendant claims that he "lived openly" during those fifteen years and that the delay was caused by the Government's failure "to exercise any amount of diligence in apprehending the Defendant to answer for the crimes."[42]  The Government responds that there was no Sixth Amendment violation because (1) Defendant caused the delay by evading the Government's diligent efforts to find and arrest him and (2) Defendant cannot point to any specific prejudice that was caused by the delay.[43]

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the

---

[41]Defendant's Memo, attached to Defendant's Motion, Docket Entry No. 37-1, p. 5.

[42]Id.

[43]Government's Response, Docket Entry No. 38, pp. 15-20 ¶¶ 33-38.

-13-

right to a speedy . . . trial." U.S. CONST. amend. VI.  Courts
deciding speedy trial claims consider four factors:  (1) whether
delay before trial was uncommonly long; (2) whether the government
or the criminal defendant is more to blame for the delay;
(3) whether, in due course, the defendant asserted his right to a
speedy trial; and (4) whether he suffered prejudice as a result of
the delay.  Doggett v. United States, 112 S. Ct. 2686, 2691 (1992)
(citing Barker v. Wingo, 92 S. Ct. 2182, 2192 (1972)).  Courts do
not regard any of the four factors as "either a necessary or
sufficient condition to the finding of a deprivation of the right
of speedy trial. . . . courts must still engage in a difficult and
sensitive balancing process." Barker, 92 S. Ct. at 2193.

1.   Length of Delay

Defendant's original indictment was issued in 2004,[44] and he
claims that he first became aware of the charges when he was
arrested on a provisional arrest warrant in March of 2020.[45]  A
delay of more than fifteen years is "uncommonly long."  See
Doggett, 112 S. Ct. at 2691.  In the Fifth Circuit a delay of a
year or more triggers an examination of the other factors.
United States v. Duran-Gomez, 984 F.3d 366, 374 (5th Cir. 2020)
(citing Goodrum v. Quarterman, 547 F.3d 249, 257-58 (5th Cir.

---

[44]Indictment, Docket Entry No. 32.

[45]Defendant's Memo, attached to Defendant's Motion, Docket
Entry No. 37-1, p. 7.

-14-

2008)).   A fifteen-year delay weighs against the Government but does not automatically warrant dismissal of the indictment — it merely requires the court to continue its inquiry.   See Barker, 92 S. Ct. at 2192 ("The length of the delay is to some extent a triggering mechanism.   Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."); United States v. Valencia-Quintana, 136 F. App'x 707, 709 (5th Cir. 2005) ("The first factor, length of delay, is a 'triggering mechanism' for determining whether the court is required to balance the remaining three factors.").

### 2.   Cause of Delay

The cause of the delay is often the most important factor in a court's speedy trial analysis — it is "[t]he flag all litigants seek to capture . . . ."   United States v. Loud Hawk, 106 S. Ct. 648, 656 (1986).   In fact "a careful review of speedy trial jurisprudence reveals that while all four factors are relevant, the second factor — who is more to blame for the delay — often dictates the outcome of cases."   United States v. Fernandes, 618 F. Supp. 2d 62, 67 (D.D.C. 2009) (citing Loud Hawk, 106 S. Ct. at 656 and United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988)).

"The burden is on the government to assign reasons to justify the delay."   Amos v. Thornton, 646 F.3d 199, 207 (5th Cir. 2011) (internal quotations and citations omitted).   Different reasons are

-15-

entitled to different weight:  "At one extreme, a deliberate delay to disadvantage the defense is weighted heavily against the state. At the other end of the spectrum, delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the state."  <u>Goodrum,</u> 547 F.3d at 258.  "If the government diligently pursues a defendant from indictment to arrest, a speedy trial claim will always fail without a showing of actual prejudice." <u>United States v. Cardona,</u> 302 F.3d 494, 497 (5th Cir. 2002) (quoting <u>United States v. Bergfeld,</u> 280 F.3d 486, 489 (5th Cir. 2002)).  "In cases where the defendant is missing, 'the government is not required to exhaust all conceivable avenues' in finding him or her." <u>United States v. Machado,</u> 886 F.3d 1070, 1080 (11th Cir. 2018) (quoting <u>United States v. Bagga,</u> 782 F.2d 1541, 1543 (11th Cir. 1986)).  The Sixth Amendment requires only that the government make a "diligent, good-faith effort" to find the defendant and bring him to trial.  <u>Id.</u>

The timing and circumstances of Defendant's leaving the RHAPSODY OF THE SEAS strongly suggest a deliberate flight from justice.  Defendant claims that after leaving the ship he "returned to his home territory of Nicaragua and remained there and in and around the Latin American region for the next 15 years."[46]  He also claims that in the ten years between his indictment and his 2014 arrest, he "on many occasions traveled throughout Latin America

---

[46]Defendant's Memo, attached to Defendant's Motion, Docket Entry No. 37-1, p. 6.

-16-

using his legal name of 'Elias Luis Herrera Hernandez.'"[47]   But Defendant provides no details as to when, where, or how he traveled.   Since 2005 he has been subject to an INTERPOL Red Notice[48] that could have resulted in his arrest any time he tried to legally cross international borders.   After the Nicaraguan government issued a Red Notice for his arrest in 2013,[49] Defendant would have found it difficult not only to travel openly throughout Latin America but also to reside in Nicaragua as he claims he was doing.   The court concludes that it is more likely that Defendant lived and traveled by using falsified documents such as the false Honduran ID card[50] and false Nicaraguan passport[51] that were found in his possession when he was arrested, or that he otherwise lived and traveled "off the grid."

The fact that the Government promptly issued a Red Notice for Defendant's arrest weighs in the Government's favor.   <u>See</u> <u>United States v. Frederick</u>, 789 F. App'x 123, 129 (11th Cir. 2019) (listing a Red Notice as one of several measures government took constituting "reasonably diligent" investigative efforts); <u>United States v. Demirtas</u>, 204 F. Supp. 3d 158, 175 (D.D.C. 2016)

---

[47]<u>Id.</u> at 7-8.

[48]Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 2 ¶ 15.

[49]<u>Id.</u> ¶ 17.

[50]<u>Id.</u> at 3 ¶ 21.

[51]<u>Id.</u> at 4 ¶ 22.

("The U.S. government also kept in periodic contact with the French regarding the status of the proceedings, and disseminated through Interpol a Red Notice seeking [defendant's] detention, . . . — further evidence that it was earnestly pursuing [him]."); United States v. Zavisic, No. 07-CR-193-A, 2013 WL 6145751, at *5 (W.D.N.Y. Nov. 21, 2013) ("Here, this Court concludes that the date the government filed the Red Notice with Interpol . . . is the date the length of delay concludes.").

Although the filing of a Red Notice alone does not prove the Government's diligence, see United States v. Handa, 266 F. Supp. 3d 443, 448 (D. Mass. 2017) (faulting the government for making no effort to pursue a case for two years after filing a Red Notice), the Government took additional measures to find Defendant: The FBI sent an agent to Panama to locate Defendant in Nicaragua in 2004,[52] regularly checked the NCIC database to confirm that Defendant's warrant was still valid and that he was still wanted,[53] sent an agent to Mexico City in 2007 to determine whether Defendant had traveled there,[54] again sought the help of Nicaraguan authorities to locate Defendant after the Nicaraguan government issued its 2013

---

[52]Government's Response, Docket Entry No. 38, pp. 5-6 ¶ 14; Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 2 ¶ 14.

[53]Affidavit, Exhibit 1 to Government's Response, Docket Entry No. 38-1, p. 2 ¶ 13.

[54]Id. ¶ 16.

Red Notice,[55] and diligently ensured that its own Red Notice was still in effect in October of 2017.[56]  Although these measures were unsuccessful in locating Defendant, nothing in the record suggests that they were unsuccessful because the Government lacked diligence — more likely they were unsuccessful because Defendant did not want to be located.

Defendant points to other actions that he alleges the Government could have taken to locate him sooner,[57] but the Government is not required to "exhaust all conceivable avenues" in finding a fugitive.  See Machado, 886 F.3d at 1080.  The court concludes that it was Defendant's evasiveness, not a lack of Government diligence, that caused the fifteen-year delay between Defendant's indictment on sexual assault charges and his finally being arrested for said charges.

3.    Timely Assertion of Right

An assertion of the right to a speedy trial is a "demand for a speedy trial."  Duran-Gomez, 984 F.3d 378 (quoting United States

---

[55]Id. at 3 ¶ 18.

[56]Id. ¶ 19.

[57]See, e.g., Defendant's Memo, attached to Defendant's Motion, Docket Entry No. 37-1, p. 8 ("In 2013, almost 10 years after the indictment, the Defendant and his wife gave birth to a baby boy in Costa Rica.  The Defendant is listed as the father on the child's birth certificate, which is available in the governmental civil registry of Costa Rica."); id. at 17 ("A mere Google search at the time of the Costa Rican arrest in 2014 would have alerted even an unsophisticated party as to where they could find the Defendant.").

v. Frye, 489 F.3d 201, 211 (5th Cir. 2007)).  If a defendant waits too long to assert his right, his "silence will be weighed against him."  United States v. Parker, 505 F.3d 323, 329-30 (5th Cir. 2007).  A defendant is not charged with asserting his right to a speedy trial until he is notified of the pending charges against him.  See Doggett, 112 S. Ct. at 2691.  Absent some evidence that the defendant was aware of the charges prior to his arrest, the assertion of the speedy trial right after arrest will not be taxed against the defendant.  See id.

Defendant claims that he has "asserted this right timely and as soon as practically possible under the facts."[58]  The Government does not dispute this, and nothing in the record indicates that Defendant was slow to assert the right after he learned of the charges against him.  The court concludes that Defendant has timely asserted his right to a speedy trial.

## 4.   Prejudice

Defendant argues that prejudice should be presumed here because "**excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or . . . identify.**"[59]  The Fifth Circuit has held that delay longer

---

[58]Id. at 18.

[59]Id. at 20 (quoting Doggett, 112 S. Ct. at 2693); see also Defendant's Reply, Docket Entry No. 39, p. 9 ("[P]rejudice is presumed by the courts after such a remarkable passage of time and therefore, does not need to [be] established or proven to be successful on a speedy trial violation allegation.").

than five years gave rise to the presumption of prejudice "when at least five years of the case's total delay is due to the government's negligence or bad faith and the defendant asserted his speedy trial right." Duran-Gomez, 984 F.3d at 379; see also United States v. Serna-Villarreal, 352 F.3d 225, 230-31 (5th Cir. 2003) (noting that while a defendant ordinarily bears the burden of demonstrating prejudice, "a defendant can be relieved from bearing this burden in circumstances where the first three Barker factors weigh so heavily in favor of the defendant that prejudice is to be presumed."); Cardona, 302 F.3d at 498 ("Under Doggett and Bergfeld, the first three factors 'should be used to determine whether the defendant bears the burden to put forth specific evidence of prejudice (or whether it is presumed).'") (quoting Bergfeld, 280 F.3d at 490). As explained above, the court finds that Defendant, not the Government, is to blame for the post-indictment delay. The court will therefore not presume prejudice but instead will hold Defendant to his burden of showing that actual prejudice exists.

"'Actual prejudice' is assessed in light of the three following interests of the defendant: (1) 'to prevent oppressive pretrial incarceration'; (2) 'to minimize anxiety and concern of the accused'; and (3) 'to limit the possibility that the defense will be impaired.'" United States v. Harris, 566 F.3d 422, 433 (5th Cir. 2009) (quoting Barker, 92 S. Ct. at 2193).

Although Defendant states that his "anxiety and suffering as he awaits trial has been enormous[,]" and that he is unjustly

-21-

"being held on this charge alone[,]"[60] it is his own refusal to submit to the United States' jurisdiction that is delaying what would otherwise be a speedy trial. Defendant's current detention in Costa Rica pending extradition cannot be characterized as "oppressive" when it results from his own decision to contest extradition. If Defendant wishes for this period of incarceration and its accompanying anxiety to end, he should return to the Southern District of Texas and face the charges against him. The court will do as other district courts have done and will decline to hold incarceration-pending-extradition against the Government. See, e.g., Demirtas, 204 F. Supp. 3d at 191 (finding that the government proceeded with due diligence in seeking fugitive's extradition from Germany and that the subsequent six-month process was "within 'the typical timeframe for contested extraditions'"); United States v. Asiegbu, No. CR 02-00673 MMM, 2009 WL 413132, at *3 (C.D. Cal. Feb. 17, 2009) ("Delay due to extradition does not weigh against the government where the government move[s] with reasonable alacrity in seeking extradition.") (internal quotations and citations omitted); United States v. Reumayr, 530 F. Supp. 2d 1200, 1206 (D.N.M. 2007) ("[F]oreign countries extraditing defendants to this country are entitled to follow the extradition procedures established by their laws, and the United States is not responsible in a Sixth Amendment sense when those laws and procedures create delays, however long."); United States v.

---

[60]Id.

Lawrence, Criminal No. 4:03-00436-1, 2013 WL 6388455, at *3 (S.D. Tex. Dec. 6, 2013) ("[T]he vast majority of the delay until [defendant's] extradition to the United States was attributable to his aggressive legal actions in opposition to his extradition or to the slow pace of the Nigerian legal proceedings.").

As to the third "actual prejudice" interest — the interest of maintaining the Defendant's ability to put on a fair defense — Defendant argues that "the memories of investigators and key witnesses" will have "fade[d] over the course of the years," and that there is "legitimate concern" over "whether the evidence [in] this case was properly preserved . . . ."[61]   The Government responds that "the victim witness K.L. will be available, and other necessary witnesses are still available to testify at trial[,]" that any memory loss would harm the Government more than the Defendant as the Government would bear the burden of proof at trial, and that "the United States has preserved the relevant DNA evidence and intend[s] to introduce it at trial."[62]   Defendant replies that "the glaring issue lies with the vast scientific progress in the field of DNA processing, handling, and analysis that has occurred since 2004[,]"[63] but Defendant does not attempt to explain why modern techniques could not be applied to the still-intact physical evidence.   Defendant does not address the

_____

[61]Id.

[62]Government's Response, Docket Entry No. 38, p. 19 ¶ 38.

[63]Defendant's Reply, Docket Entry No. 39, p. 9.

Government's argument that any lost memory on the part of key witnesses would disadvantage the Government, rather than the Defendant, nor does Defendant point to any witness who could have been of help to him but is now unavailable. <u>See United States v. Chaudhry,</u> No. 00 Cr. 152(DLC), 2010 WL 4118071, at *9 (S.D.N.Y. Oct. 19, 2010) (holding that a defendant's "general assertion that his ability to defend himself has been impaired by the passage of time is insufficient to establish prejudice[,]" and noting that defendant "has not identified any witness who can be of assistance to him who has died or is otherwise unavailable due to the passage of time").

Defendant has not shown actual prejudice, nor has he shown that the delay between his indictment and his arrest is attributable to the Government. Accordingly, Defendant's Motion will also be denied on its merits.

### III. <u>Conclusion and Order</u>

For the reasons set forth above, Defendant's Motion to Dismiss the Indictment With Prejudice Based on the Violation of His Constitutional Right to a Fair and Speedy Trial (Docket Entry No. 37) is **DENIED**.

**SIGNED** at Houston, Texas, on this the 19th day of April, 2021.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE